*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *UNITED STATES OF AMERICA* | ) | |
| | ) | |
| *v.* | ) | *Criminal No. 05-105-P-H* |
| | ) | |
| *BILLY SANTANA,* | ) | |
| | ) | |
| *Defendant* | ) | |

*RECOMMENDED DECISION ON MOTION TO SUPPRESS*

Billy Santana, charged with conspiracy to distribute and possession with intent to distribute cocaine base, marijuana and cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846 and 18 U.S.C. § 2, Indictment (Docket No. 1) at 1-2, seeks to suppress cash found in the pocket of his jacket on May 3, 1998 and evidence found in a bedroom at 63 Park Street, Mechanic Falls, Maine on August 17, 1998. An evidentiary hearing was held before me on July 25, 2006 at which the defendant appeared with counsel and following which counsel for both parties submitted written briefs. I now recommend that the following findings of fact be adopted and that the motion be denied.

## I. Proposed Findings of Fact

### A. May 3, 1998

On May 3, 1998 James Theiss, a detective with the Lewiston Police Department, was on assignment with the Maine Drug Enforcement Agency ("MDEA") task force. He was informed that a state trooper had stopped a vehicle on the Maine Turnpike and found evidence of drugs in the vehicle, specifically white residue on the outside of the passenger door, which the trooper thought was evidence of someone dumping cocaine out of the car. An occupant of the vehicle said that they were headed to Rooms 201 and 226 at the Chalet Motel in Lewiston, Maine to meet "Billy." Theiss and

Agent David St. Pierre, a Lewiston police sergeant who was also serving with the MDEA at that time, went to the motel accompanied by marked police cruisers. As they approached, they observed a number of vehicles leaving the parking lot rapidly. Theiss and St. Pierre learned from the motel desk clerk that one of the two rooms in question was rented to Melissa Frank and the other to a Mr. Alejandro and that multiple occupants were staying in each room. Before they went to the two rooms, Theiss and St. Pierre saw Jason Wilson, whom they recognized from prior drug investigations, in a hallway of the motel.

Accompanied by two Lewiston police officers, Theiss and St. Pierre went to a room that Theiss testified was 201 but may have been 226 and got no answer at the door. As they moved toward the other room, they saw some occupants through the room's window, including a female who was eating. This female answered the door, whereupon Theiss and St. Pierre identified themselves as police and asked if Billy was in the room. She motioned to Billy to come to the door. Theiss recognized this man as the defendant, Billy Santana, whom he identified in the hearing room, from prior drug investigations.

The agents identified themselves to the defendant and explained why they were there. They told the defendant that a vehicle had been stopped for speeding by state troopers and that the state troopers found cocaine residue on the car and were told that its occupants were heading to this room and one other in the motel. They asked if they could come into the room. The defendant replied, "Yes, come on in." He did not hesitate in allowing the agents into the room. The agents asked for consent to search; without hesitation, the defendant told them that they could do so. The two other occupants of the room were Laura Knight and Ina Lies Santana (phonetic spelling), who identified herself as the defendant's girlfriend. They all remained in the relatively small room during the search. The defendant was never separated from the others, never handcuffed and never told that he was under

2

arrest. The agents and the defendant had no difficulty understanding each other. No weapons were drawn. The defendant was not prevented from leaving the room at any time. He did not appear to be under the influence of drugs or alcohol.

The agents searched the room, starting at one end and working their way to the other. At no time did the defendant try to stop the search. He was very cooperative at all times. Theiss found a jacket draped over a chair. He asked the defendant whose jacket it was and the defendant said that it was his. The defendant did not indicate in any way that Theiss should not search the jacket. Theiss found $2,900 in cash, in bundles wrapped with rubber bands, in one of the pockets of the jacket. The defendant said that the money had been given to him by his mother. The agents left the motel room shortly thereafter, having been in the room no more than thirty minutes.

Theiss testified without notes, having reviewed the case file; he also had an independent recollection of the events of that day. He remembered those events in part because he spent time that day with Trooper Frank, who was looking for his daughter, Melissa, the owner of the car that was stopped on the turnpike. He does not recall the weather that day or what he ate. It was Theiss's practice in 1998 to obtain written consent to search but he did not obtain written consent from the defendant on this occasion. He does not remember which pocket of the jacket the money was in or how many pockets the jacket had.

St. Pierre also testified about the events at the Chalet Motel. He testified that he and Theiss went first to Room 226, where they got no answer to their knock, and then to Room 201, which was in the back of the motel and difficult to find. It was through the window of this room that they saw two women eating pizza.

**B.  August 17, 1998**

On August 17, 1998 Theiss and St. Pierre were still serving with the MDEA.  On the afternoon of that day they were called to assist in a search of the residence of Craig Bouthot at 63 Park Street, Mechanic Falls, Maine.  They went there because they had received information through informants, other investigations and the Mechanic Falls police department that drug trafficking had been going on in the house and that Bouthot, the owner of the house, was on probation and subject to random tests for alcohol and narcotics, as well as random searches of his residence.

The agents knocked on the door and identified themselves as police officers to the person who opened the door.  In the house were five individuals.  They all said that they did not live in the house, but were just visiting.  When informed that the officers were looking for Bouthot, one person said that he was not at home.  The occupants allowed the officers into the house to look for Bouthot. Once the officers entered, all five occupants left.  The officers performed a cursory search to be sure that Bouthot was not present.  They noticed alcohol in plain view in violation of Bouthot's probation conditions.  The officers also went into a red barn on the premises but Theiss did not recall whether anyone was staying in the barn or recall other details about the barn.

The officers eventually left the premises but stayed in the area because one of the occupants of the house, Michael Sultan, had told them that Bouthot was expected back in about thirty minutes or at 4:00 p.m..  Another person approached the house.  He was stopped and identified as Alex Duff, who said that he frequently stayed overnight at the house.  Duff was told to leave and did so.

Bouthot's probation officer, Pauline Flagg, called Theiss later that evening and said that there were cars in the driveway of the house that had not been there earlier and that the lights were on in the house.  The agents went to the door with Flagg.  Bouthot answered the door and the agents informed him that they had been to the house earlier and intended to search the house under Bouthot's probation

4

conditions.  Bouthot, who was alone in the house, consented to a search of the residence.  He told them that he owned the house and appeared to Theiss to have access to the entire house.  Theiss concluded that Bouthot had authority to consent to a search of the entire house.  Bouthot never said that he did not have access to any particular room in the house or that he did not have the authority to consent to a search of the entire residence.  Theiss participates in one to two dozen probation searches per year and they usually entail a search of an entire residence.  Theiss did not obtain written consent from Bouthot.  The MDEA does not require agents to get written permission to search when oral permission has been given.

There was one bedroom downstairs in the house and one upstairs.  A state police dog, Bo, was sent through the residence to detect any narcotics that might be present.  Bo alerted or indicated on a metal file cabinet located in the second floor bedroom.  Bo's handler told the agents that the dog had hit on the contents of the file cabinet, not on what was outside it.  Both Theiss and St. Pierre testified that the door to the second floor bedroom was open, although St. Pierre added that the door was "definitely" not locked.  Theiss did not ask Bouthot for permission to search the file cabinet.  Instead, he proceeded to search the cabinet.  He found marijuana residue on top of the cabinet and inside it he found paperwork with the defendant's name on it.  He also found inside the cabinet a plastic bag containing white powder residue.  The file cabinet was not locked.  There was no dresser in the bedroom and no extensive amount of clothing.  The bed was unmade.  It did not appear to St. Pierre that anyone was staying in the room for an extended period.  Theiss thought that someone other than Bouthot was using the room.

Theiss does not recall whether Bouthot was present in the bedroom during the search.  He asked Bouthot whose bedroom that was and Bouthot replied that the defendant stayed in that room on occasion and traveled back and forth from Connecticut on a regular basis.  He said that the defendant

was then either in Connecticut or on his way there.  Bouthot was arrested on a probation violation based on what the agents found in the house.

## II.  Discussion

### A.  May 3, 1998

At the beginning of the evidentiary hearing, counsel for the defendant stated, in response to my inquiry, that with respect to the search at the Chalet Motel, the defendant seeks suppression of the cash. *See also* Defendant Santana's Post-Hearing Memorandum in Support of Motion to Suppress ("Defendant's Brief") (Docket No. 285) at 2  ("Defendant requests suppression of evidence of that cash.").  He identifies the issues as "(1) whether Santana in fact consented to a search of the room and (2) whether he consented to the separate search of his jacket." *Id*.

The defendant's argument with respect to the first identified issue[1] is essentially that there is "a genuine question as to whether any such consent was obtained" because the agents did not obtain written consent to search the room and it was Theiss's usual practice to do so.  *Id*. at 2-3.  He also contends that the agents' "recollection of the events that day is generally imprecise," and that "the government offered no business record or other corroboration for the officers' testimony that they have some recollection of Santana providing an unwritten consent to the search." *Id*. at 3.  This is the entire argument presented by the defendant on this issue, without citation to authority other than for the undisputed principle that the burden is on the government in the absence of a search warrant to demonstrate that a warrant was not required under the circumstances.  *Id*. at 5-6.

Consent to search is an exception to the warrant requirement.  *United States v. Mares*, 428 F.3d 64, 66-67 (1st Cir. 2005).  Oral consent is sufficient.  *United States v. Barnett*, 989 F.2d 546,

---

[1] The government is no longer challenging Santana's standing to object to the search of the motel room which was not rented in his name.  Government's Post-Hearing Memorandum in Opposition to Defendant's Motions to Suppress, etc. ("Opposition") (Docket No. 287) at 2 n.1.

555 (1st Cir. 1993).    Contrary to the defendant's suggestion, no evidentiary corroboration of the agents' testimony is required.  There is no evidence contradicting their testimony.  Their recollection of relatively unimportant details of the events of May 3, 1998 may be less than perfect, but their testimony about the defendant's consent and his demeanor at that time was clear, definite and unimpaired.  I do not find Theiss's unexplained failure to obtain written consent to a less-than-30-minute search of a small motel room not registered to any of its three inhabitants, in contrast to his usual procedure of obtaining written consent to search, to be sufficiently significant to support a conclusion that he lied when he testified that the defendant provided oral consent.[2]  The evidence that St. Pierre was lying when he also so testified is even less compelling.  To the extent that the defendant means to suggest that both agents simply forgot that they did not obtain his consent to search, I have no trouble rejecting that claim.  Law enforcement officers with 16 years and 14 years of experience know how important it is to obtain consent to search and are highly unlikely to forget to do so or to forget that they have done so.

In the section of his memorandum entitled "The Evidence," the defendant asserts that "[n]either officer, in any event, claimed that Santana expressly consented to the search of his jacket from which $2,900.00 was seized."  Defendant's Brief at 3.  He does not return to this assertion in the section of his memorandum entitled "Discussion," and accordingly it is not clear whether he means to argue that suppression of the cash is required because no such  separate consent was obtained.  He cites no authority for such a contention.  To the extent that this issue has been properly raised, the government responds that "the Defendant gave no indication that he wished to withdraw his consent as to that jacket."  Opposition at 5.  I agree with the government, *id*., that the fact that the defendant readily

---

[2] The defendant asserts that both Theiss and St. Pierre testified that "their practices had included obtaining written consent to conduct such consensual searches."  Defendant's Brief at 2.  Actually, Theiss testified that he regularly obtained written consent; St. Pierre testified that he did so "on occasion."

stated that the jacket belonged to him when he was asked by Theiss about its ownership is some evidence of implicit separate consent to search the jacket. But, in any event, no separate consent was necessary under the circumstances. My research has located no reported cases in which an article of clothing was the object for which a defendant contended that separate consent to search was required after consent to search the room in which the clothing was found had been given, but one reported case is closely analogous. In *United States v. Al-Marri*, 230 F.Supp.2d 535 (S.D.N.Y. 2002), the defendant asserted that his consent to search his home did not extend to allowing the government to seize his computer for inspection of its hard drive. *Id*. at 538. Finding that the defendant was asked for permission to search his entire home, that he agreed to shut the computer down and put it into a carrying case and that he did not place any explicit limitation on the scope of the search of his home or of the computer, the court held that "it was reasonable for [the agents] to have understood that this unrestricted granted of access [to the computer] . . . indicated that [the defendant] had no qualms about an extensive search of his computer," that a computer should be treated as if it were a closed container and that "the general rule holds that separate consent to search such an item found within a fixed premises is unnecessary," and denied the motion to suppress. *Id*. at 540-41. The same analysis applies to the defendant's jacket.

The motion with respect to the cash found in the jacket at the Chalet Motel on May 3, 1998 should be denied.

### B. August 17, 1998

The defendant devotes most of his written submissions to this search. He asserts that the agents "believed that the room in which the file cabinet was found was occupied by someone other than Bouthot," that they "offered no explanation for why they believed Bouthot had . . . the right to consent to a search of some other person's property," Theiss "testified that he expected the file cabinet

to contain . . . the personal property of someone other than Bouthot" and that "[t]here was no evidence that Bouthot was asked or that he told the officers that he owned the file cabinet, had the right to look in the file cabinet or ever did look in the file cabinet." Defendant's Brief at 6-7. Thus, he contends, no valid consent was given to the search of the file cabinet — a "separate container" — in what he characterizes as his room. *Id*. at 7. The government responds that "the agents were authorized to search the entire premises pursuant to a State probation search waiver condition attached to Bouthot's probation and residence and pursuant to Bouthot's apparent authority to consent to a search of his entire house." Opposition at 5-6. It does not respond otherwise to the defendant's contention that the agents needed separate consent to search the file cabinet under the circumstances.

The case law cited by the defendant addresses only separate containers located in a guest's room. Defendant's Brief at 7-8. While he twice mentions "the evidence . . . seized from Santana's room" in general in his post-hearing brief, *id*. at 1, 6, the defendant cannot reasonably be said to have offered an argument about any evidence other than that found inside the file cabinet — the "separate container." *See also* Defendant Santana's Post-Hearing Reply Memorandum in Support of Motion to Suppress ("Defendant's Reply") (Docket No. 288) at 2 ("Prior to the Hearing Defendant Specifically Identified the Evidence He Sought to Suppress as Including Any and All Evidence Found in the File Cabinet in His Room That Contained His Personal Papers and Property"), 4 ("The Special Needs Probation Exception for Probationer Searches Does Not Authorize the Search of the File Cabinet"). I therefore conclude that the defendant has not challenged the seizure of the marijuana residue found on top of the file cabinet, and that that evidence should not be suppressed.

In upholding a search of the residence of a probationer subject to a probation condition of submitting his residence to search at any time by any law enforcement officer for investigatory rather than probationary purposes, the Supreme Court held that the actual motivation of the law enforcement

9

officers conducting the search was irrelevant.  *United States v. Knights*, 534 U.S. 112, 114, 116, 121-22 (2001).  Thus, whether Theiss was looking for evidence of drug trafficking by individuals other than Bouthot when he entered the house is irrelevant.  Neither side in this case has offered a copy of the Bouthot probation order into evidence.  In this case, the court has only Theiss's testimony that as a term of his probation Bouthot was subject to random searches and tests for alcohol and narcotics and St. Pierre's testimony that Bouthot was subject to random searches as a condition of his probation.  This makes the government's reliance on the line of "dual law enforcement purposes" case law, Opposition at 6, somewhat problematic.  The specific statutory, regulatory or court-order terms of probation with respect to searches played a significant part in two of the three cases cited by the government.  Opposition at 6; *see Knights*, 534 U.S. at 114; *Griffin v. Wisconsin*, 483 U.S. 868, 870-71 (1987).  In *United States v. Cardona*, 903 F.2d 60, 66 (1st Cir. 1990), the issue was whether a parole violation warrant, having been issued, could validly be served by police officers unaccompanied by a parole officer, an issue of little help in the present inquiry.

The First Circuit "do[es] not read *Griffin* as approving only probation searches conducted pursuant to a legislative or administrative framework."  *United States v. Giannetta*, 909 F.2d 571, 575 (1st Cir. 1990).  But it does require "[s]imilar guidance and constraints" in the particular conditions of probation included in a criminal sentence.  *Id*.  Bouthot's conditions of probation included random searches of his residence; the next step in the court's inquiry requires a resolution of the question whether the authority bestowed on law enforcement officers by that term in a probation order extends to closed containers in the probationer's residence as to which it has not been established that the officers reasonably believed the probationer exercised at least shared access and control.  In this case, the agents had the reasonable suspicion that allowed them to search Bouthot's residence; they had received information from more than one source that Bouthot was allowing his

10

residence to be used for drug trafficking.  In *Giannetta*, the First Circuit said that "[a]ny container may be searched if it is reasonable to believe that the container could conceal the object of the search." 909 F.2d at 577.  None of the containers searched in that case apparently belonged to or were used by anyone other than the probationer, however.  Here, the agents clearly could search Bouthot's house for illegal drugs on the basis of their reasonable suspicion, but the government has not offered evidence that the agents reasonably believed that Bouthot had dominion over or use of the file cabinet at the time Theiss searched it.  I conclude that such a showing is not required.

My own research has not located case law in which the common law of probation searches has been applied to containers located in the probationer's home but known to the searching officers to be used or owned by third parties, but a logical extension of *Giannetta* would allow such containers to be searched without the expressed consent of the owner or primary user of the container.

The defendant asserts, without citation to authority, that the holding of *Knights* cannot be extended to those areas of a probationer's residence, including containers within his residence, that are not subject to the probationer's control.  Defendant's Reply at 5.  The problem with this formulation of the argument is that it presumes that Bouthot had no control over the unlocked bedroom which the defendant occasionally occupied and the unlocked file cabinet inside that room.  That assumption must be based on actual evidence.  In this case, the evidence on this point is scant.  Both agents testified that the bedroom door was not locked; Theiss testified that the file cabinet was not locked.  Theiss testified that he interpreted Bouthot's consent to search to extend to the file cabinet, but that interpretation may not have been reasonable given Theiss's testimony that he "figured" that the bedroom was occupied by someone other than Bouthot before he opened the file cabinet.

This is a close case, in which more evidence that presumably was available to the government would have been helpful.  I conclude that the case law governing probation violation searches does

control the situation presented in this case and that it should override any inconsistencies generated by the case law of warrantless searches in general. To do otherwise would, as the government suggests, allow a probationer to escape liability for probation violations by inviting a guest to stay in his or her residence and storing any contraband in a container in the guest's bedroom. Contrary to the defendant's suggestion, it is not readily apparent how law enforcement officers could determine that the probationer was doing so in order to support an application for a warrant to search the container.

This conclusion makes it unnecessary to consider the parties' alternative arguments concerning the question whether Bouthot's consent could extend to the file cabinet and whether the agents reasonably believed that his consent extended to the file cabinet under the circumstances.

## Conclusion

For the foregoing reasons, I recommend that the proposed findings of fact herein be adopted and the defendant's motion to suppress be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 10th day of August, 2006.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge